UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
AT LEXINGTON
CASE NO. 04- CV-84-KSF

Eastern District of Kentucky
FILED
FEB 24 2004
AT LEXINGTON
LESLIE G WHITMER
CLERK U S DISTRICT COURT

STATIC CONTROL COMPONENTS, INC.                                    PLAINTIFF

v.            **COMPLAINT FOR DECLARATORY JUDGMENT**

LEXMARK INTERNATIONAL, INC.                                        DEFENDANT

Serve:  CT Corporation System
        Kentucky Home Life Building
        Room 1102
        Louisville, Kentucky 40202

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

COMES NOW Plaintiff Static Control Components, Inc. ("SCC"), pursuant to 28 U.S.C. § 2201, the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Eastern District of Kentucky, and does hereby state its Complaint for Declaratory Judgment against Defendant Lexmark International, Inc. ("Lexmark") as follows:

### Introduction

1. SCC has developed re-engineered replacement chips for certain Lexmark laser printer toner cartridges. These replacement chips include only original computer programs that were created by and at the direction of SCC (the "new chips").

2. Beginning on or about February 24, 2004, SCC began manufacturing and offering for sale the new chips. SCC markets these new chips to toner cartridge remanufacturers so as to replace used, broken or missing microchips on Lexmark cartridges, including for the remanufacture of non-Prebate cartridges, and for the remanufacture of Prebate cartridges purchased after October 1, 2003, in the state of North Carolina.

3. SCC seeks in this action a declaratory judgment in favor of SCC so as to establish that SCC's new re-engineered replacement toner cartridge chips can be manufactured, offered for sale and sold in the United States under copyright law and under the Digital Millennium Copyright Act of 1998, 17 U.S.C. § 1201, *et seq*. ("DMCA").

## Jurisdiction and Venue

4. SCC brings this action under 28 U.S.C. §§ 1331 and 1338 to obtain a declaratory judgment of no copyright infringement and no violation of Section 1201(a)(2) of the DMCA, 17 U.S.C. § 1201(a)(2).

5. Personal jurisdiction exists in that Lexmark resides in and is doing business in the State of Kentucky and this District.

6. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(a).

## The Parties

7. Plaintiff SCC is a North Carolina corporation with its principal place of business in Sanford, Lee County, North Carolina. SCC, *inter alia*, is a leading supplier of toner and parts and components to toner cartridge remanufacturers. SCC supplies, among other things, toner and other components used by remanufacturers in remanufacturing various brands of computer printer toner cartridges, including Lexmark toner cartridges.

8. Remanufacturers take used original equipment manufacturer ("OEM") laser toner cartridges, inspect and clean the toner cartridges, replace any worn components in the toner cartridges, and add new toner. The resulting remanufactured laser toner cartridge is sold at a substantial discount when compared to the price of a new toner cartridge.

9. Defendant Lexmark, on information and belief, is a Delaware corporation with a principal place of business in Lexington, Kentucky.

10. Lexmark is an OEM of laser printers and laser toner cartridges.

11. Lexmark sells a variety of computer printer models, including the T520/522, T620/622 and T630 laser printers. Lexmark also sells these printers to other computer and computer peripheral manufacturers, under the brand names of such manufacturers and using different model numbers, including IBM Corporation, Toshiba Corporation and Dell, Inc. Lexmark designs its printer models so that only a Lexmark-designed toner cartridge for that particular model will work in a given model of a Lexmark laser printer. Thus, in order for a Lexmark printer to function, it must have either a new or remanufactured Lexmark toner cartridge.

## Lexmark Cartridges and Prior SCC Chips

12. In 2001, Lexmark introduced printer toner cartridges for its T520/522 and T620/622 laser printers containing "disabling chip" microchips. These microchips incorporated a mechanism that enables the Lexmark printer to verify that the toner cartridge chip (and, therefore, the toner cartridge) came from Lexmark. As relevant to this proceeding, whenever a toner cartridge is inserted into a Lexmark printer, the printer is powered on, or the printer is opened and closed, a "handshake" is performed between software in the printer that Lexmark calls a "Printer Engine Program" ("PEP") and software on the disabling chip to verify that only toner cartridges authorized by Lexmark are used. If this "handshake" does not occur, the printer will not print.

13. SCC reverse engineered the Lexmark disabling chips, and designed compatible replacement chips sold under the brand name "SMARTEK" that restored printer and cartridge

functionality disabled by the Lexmark chip. The SMARTEK chips consisted of Texas Instruments chip hardware that incorporated substantial original software developed by SCC that enabled exchange of information and interoperability between the SMARTEK chip and the Lexmark printer. In or around September 2002, SCC began manufacturing and selling its SMARTEK replacement chips.

### SCC's Independent Creation of New Re-engineered Replacement Chips

14. In 2002, SCC had begun developing software programs that provided additional functionality for a more advanced generation of replacement chips.

15. The new chips incorporate portions of the original software written by SCC that was on the prior SMARTEK chips, and new software written by SCC that performs functions not previously available on either the Lexmark or SCC SMARTEK chips, on a new and different chip hardware platform. These functions of the SCC new chips include maintenance functions relating to communications between the printer and the toner cartridge chip, and enhancement of print quality when the print cartridges are in a "toner low" condition.

16. SCC registered its copyrights in its original programs used in the new chips for the T520/522 and T620/622 toner cartridges with the United States Copyright Office. SCC has applied to register its copyright in its original programs used in the new chips for the T630 toner cartridges with the United States Copyright Office.

17. The new chips also contain a software routine that approximates the level of toner in the printer toner cartridge. The routine for measuring toner was independently written using a "clean room" procedure, by a computer science student who was not employed by SCC and had no access to the source code of a routine used by Lexmark that Lexmark calls a "Toner Loading Program" ("TLP") and that Lexmark asserts performs a similar function. After running the

routine on actual printers, minor corrective changes were made by SCC so as to improve interoperation between the SCC programs on the cartridge and software in the Lexmark printer.

18. The toner measuring programs on the new chips include no code copyrighted by Lexmark. They do not include any code from the "TLPs" or the "PEP."

19. The above-referenced functions and the maintenance and print quality functions performed by the original SCC software programs on the new chips require the exchange of information during communication between the chip and the printer. The maintenance software on each new chip exchanges data with the PEP that instructs the printer to display an error message upon failure of the particular monitored communications functions. The print quality enhancement software program similarly exchanges data with the printer that causes the printer to reduce the amount of toner being deposited on the paper by the printer.

20. Prior to manufacturing or offering for sale the new chips, SCC provided Lexmark with an opportunity to review and ask questions about the code on the new chips. In early July 2003, SCC's counsel provided outside counsel for Lexmark with copies of program code contained on the new chips for the T520/522 and T620/622 cartridges, pursuant to a confidentiality agreement. On July 24, 2003, SCC counsel, its computer science expert Dr. Benjamin Goldberg, and the SCC engineer who wrote the copyrighted code for the new chip, held a two-hour video conference with counsel for Lexmark and their expert, Dr. Bruce Maggs. During that video conference, SCC responded to Lexmark counsel's questions, and SCC representatives explained the operation of the pre-existing and new programs written by SCC for the new chip, the "clean room" procedure by which the new toner measuring program was written, and the code that implements that program.

21. In August 2003, Lexmark counsel informed SCC counsel, without explanation, of Lexmark's view that the new SCC chips would violate the DMCA, and would not concede that the software for the new chips did not infringe Lexmark's copyright. Thereafter, Lexmark continued to contend that manufacture of a new chip by SCC containing software written by SCC still would violate the DMCA.

22. After August 2003, SCC continued to test the software for the new chips and, as a result, made certain minor revisions to the code so as to run the programs on different chip hardware and to improve reliability and operation. SCC further adapted the code for use with the Lexmark T630 printer.

23. In February 2004, SCC manufactured in North Carolina a number of the re-engineered replacement chips for use in Lexmark toner cartridges.

24. The new chips have lawful uses for remanufacturing and repairing of Lexmark laser printer toner cartridges.

25. SCC has sold these chips to date exclusively to remanufacturers of toner cartridges for the Lexmark T520/522, T620/622 and T630 printers for use in remanufacturing Prebate cartridges that were purchased in North Carolina after October 1, 2003, and for use in remanufactured non-Prebate cartridges for those printers. SCC intends to sell such chips also for use in remanufacturing such cartridges for the above-identified families of printers that are manufactured by Lexmark but sold under the brand name of other companies.

## COUNT ONE

### DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF COPYRIGHT

26. SCC incorporates by reference the facts of paragraphs 1-25 as if set forth herein in their entirety.

27. The re-engineered replacement chips include software code created by and copyrighted by SCC.

28. The new chips include no copyrighted software code from the Lexmark PEPs or TLPs.

29. The new chips include no code that is substantially similar to code from the Lexmark PEP or TLPs.

30. The software code on the new chips does not infringe any Lexmark copyright.

## COUNT TWO

## DECLARATORY JUDGMENT OF NO VIOLATION OF 17 U.S.C. § 1201(A)(2)

31. SCC incorporates by reference the facts of paragraphs 1-30 as if set forth herein in their entirety.

32. Section 1201(a)(2) of the DMCA, 17 U.S.C. § 1201(a)(2), provides:

(2) No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that —

(A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title;

(B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under this title; or

(C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected under this title.

33. SCC's re-engineered replacement chips do not violate section 1201(a)(2) because the Lexmark "handshake" protects against use in a Lexmark printer of cartridges other than

7

cartridges authorized for use by Lexmark, and does not protect a copyrighted work, *i.e.*, a "work protected under this title."

34. SCC's re-engineered replacement chips do not violate section 1201(a)(2) because the Lexmark "handshake" does not prevent anyone from encountering, obtaining, viewing and copying the PEP, but only protects against use of the PEP in a Lexmark printer with cartridges other than cartridges authorized for use by Lexmark, and does not "effectively control access" to the PEP.

## COUNT THREE

### DECLARATORY JUDGMENT OF NO VIOLATION OF 17 U.S.C. § 1201(A)(2)

35. SCC incorporates by reference the facts of paragraphs 1-34 as if set forth herein in their entirety.

36. In order to create chips that can interoperate with the PEP in the Lexmark T520/522, T620/622 and T630 printers, SCC needed to understand how to gain access to the PEP for those printers to enable the SCC new chips to operate. Access to the PEP is necessary for any use of that program in conjunction with a Lexmark toner cartridge.

37. Unless the new chips are able to perform the authentication "handshake" with the PEPs, the PEPs will neither obtain information from the new chips nor allow the PEPs to be used to operate the printer's functions.

38. Unless the new chips are able to perform the authentication "handshake" with the PEPs, the new programs created by SCC on the new chips cannot interoperate with the PEPs and, therefore, will not be able to perform their functions and make available to the consumer their functionality and competitive choices for remanufactured Lexmark cartridges, including

non-prebate cartridges and Prebate cartridges sold after October 1, 2003 in the State of North Carolina.

39. SCC may lawfully identify and analyze those portions of the PEPs necessary for interoperability with the software for the new chips, circumvent protections offered by the authentication "handshake," and distribute in commerce to others its original programs along with the means of circumventing the Lexmark technological protection measure, for the sole purpose of enabling interoperability between the new chip software and the PEPs.

40. For the reasons set forth in Count Two, the SCC new chips do not violate section 1201(a)(2) of the DMCA, because section 1201(a)(2) does not apply to the circumvention of the "handshake" as deployed by Lexmark.

41. Even if section 1201(a)(2) were to so apply, SCC's activities of developing, manufacturing, marketing and selling its re-engineered replacement chips are exempt under section 1201(f) of the DMCA.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Static Control Components, Inc. is entitled to and hereby requests the following relief:

A. A declaratory judgment on Count One of this Complaint that the software programs on the re-engineered replacement chips do not infringe any copyright of Lexmark;

B. A declaratory judgment on Count Two of this Complaint that the manufacture, marketing and sale of the new chips do not violate section 1201(a)(2) of the DMCA, 17 U.S.C. § 1201(a)(2);

C. A declaratory judgment on Count Three of this Complaint that, even if the provisions of section 1201(a)(2) were to apply to the Lexmark "handshake," SCC is entitled,

pursuant to section 1201(f) of the DMCA, 17 U.S.C. § 1201(f), to manufacture, offer to the public, provide and sell its new chips; and,

D. Such other relief as this Honorable Court may deem just and proper.

This the 24th day of February, 2004        Respectfully submitted,

*[signature]*

W. Craig Robertson III
E. Christine Lewis
WYATT, TARRANT & COMBS, LLP
250 West Main Street, Suite 1600
Lexington, KY 40507
859.233.2012

Skip London
Static Control Components, Inc.
3010 Lee Avenue
Post Office Box 152
Sanford, NC 27331
919.774.3808

Seth D. Greenstein
Melise R. Blakeslee
John R. Fuisz
Carrie Shufflebarger
Ann M. Brose
MCDERMOTT, WILL & EMERY
600 13th Street NW
Washington, D.C. 20005
202.756.8000