UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

| | |
|---|---|
| STATIC CONTROL COMPONENTS, INC., <br><br>    PLAINTIFF/COUNTERCLAIM <br>    DEFENDANT <br><br>v. <br><br>LEXMARK INTERNATIONAL, INC., <br><br>    DEFENDANT/COUNTERCLAIM <br>    PLAINTIFF <br><br>v. <br><br>WAZANA BROTHERS INTERNATIONAL, INC. d/b/a MICRO SOLUTIONS ENTERPRISES <br><br>    COUNTERCLAIM DEFENDANT <br><br>v. <br><br>STATIC CONTROL COMPANIES, INC. <br><br>    COUNTERCLAIM DEFENDANT <br><br>v. <br><br>NER DATA PRODUCTS, INC. <br><br>    COUNTERCLAIM DEFENDANT | Pending in the United States District Court <br> Eastern District of Kentucky <br> Honorable Gregory F. Van Tatenhove <br> Civil Action 04-CV-84-GFVT. |

**MOTION TO QUASH IMPROPER SUBPOENA
SERVED ON OPPOSING PARTY'S TRIAL COUNSEL
(INCLUDING MOTIONS TO FILE TWO EXHIBITS UNDER SEAL)**

**Exhibit 6**
October 18, 2006 Subpoena to Bartlit Beck attaching 1999 Opinion Letter

**Filed Under Seal Pursuant to D.C.COLO.LCivR 7.2**

Dated: October 30, 2006. Respectfully submitted,

/s/Joseph C. Smith, Jr.
Joseph C. Smith, Jr.
Alison G. Wheeler
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
1899 Wynkoop Street, 8th Floor
Denver, CO 80202
Telephone: (303) 592-3100
Facsimile: (303) 592-3140

Issued by the
# United States District Court
### DISTRICT OF COLORADO

SUBPOENA IN A CIVIL CASE

Static Control Components, Inc.
    Plaintiff/Counterclaim Defendant

v.

Lexmark International, Inc.
    Defendant/Counterclaim Plaintiff

v.

Wazana Brothers International, Inc.
d/b/a Micro Solutions Enterprises
    Counterclaim Defendant

v.

Pendl Companies, Inc.
    Counterclaim Defendant

v.

NER Data Products, Inc.
    Counterclaim Defendant

Civil Action No. 04-CV-84-GFVT
Pending in United States District Court,
Eastern District of Kentucky
Honorable Gregory F. Van Tatenhove

To: **Bartlit Beck Herman Palenchar & Scott LLP**
Attn: Joseph C. Smith, Jr.
1899 Wynkoop Street, 8th Floor
Denver, Colorado 80202

_____ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

| __X__ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case pursuant Fed. R. Civ. P. 45. See Exhibit B for the deposition topics. ||
|---|---|
| PLACE OF DEPOSITION<br>Courtyard by Marriott<br>934 16th Street<br>Denver, Colorado 80202<br>(or other mutually agreeable location) | DATE AND TIME<br><br>November 8, 2006 at 9:00 a.m. |
| __X__ YOU ARE COMMANDED to produce and permit inspection and copying of documents or things at the place, date, and time specified below. See Exhibit A for the requests for documents and things. ||
| PLACE<br>Banner & Witcoff, Ltd.<br>10 South Wacker Drive<br>Suite 3000<br>Chicago, Illinois 60606<br>(or other mutually agreeable location) | DATE AND TIME<br><br>October 27, 2006 at 9:00 a.m. |
| _____ YOU ARE COMMANDED to produce and permit inspection of the following premises at the date and time specified below ||
| PREMISES | DATE AND TIME |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| Issuing Officer Signature and Title (Indicate if attorney for Plaintiff or Defendant)<br>Attorney for Defendant/Counterclaim Plaintiff, Lexmark International, Inc.<br><br>*/s/ Jason Shull/* | Date<br><br>October 18, 2006 |
|---|---|

Issuing Officer's Name, Address, and Phone Number
Jason S. Shull, Banner & Witcoff, Ltd., 10 South Wacker Drive, Suite 3000, Chicago, Illinois, 60606, (312) 463-5000

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |
| SERVED ON (PRINT NAME) | | MANNER OF SERVICE |
| SERVED BY (PRINT NAME) | | TITLE |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on:_____
     DATE

Signature of server:

Address of server:

# Rule 45, Federal Rule of Civil Procedure, Parts C & D

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

    (1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

    (2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

    (2)(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection is made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

    (3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

        (I) fails to allow reasonable time for compliance;

        (ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

        (iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

        (iv) subjects a person to undue burden.

    (B) If a subpoena

        (I) requires disclosure of a trade secret or other confidential research, development, of commercial information, or

        (ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

        (iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

    (1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

    (2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## EXHIBIT A

Pursuant to Federal Rule of Civil Procedure 45 and directed by the subpoena attached hereto, which has been issued by the District of Colorado, you are requested to produce all documents and things within the scope of the following definitions and descriptions that are within your possession, custody, or control. With respect to documents and things withheld under a claim of privilege, you are required under Rule 45 to describe the nature of the documents and things withheld in a manner sufficient to enable the demanding party to contest the claims.

### DEFINITIONS

1. The term "Bartlit Beck" means Bartlit Beck Herman Palenchar & Scott LLP, its past and current employees, attorneys, licensees, agents, representatives, and investigators, as well as any company name under which Bartlit Beck is or was doing business, its predecessors, directors, officers, employees, agents, and each person acting or purporting to act on its or their behalf or under its or their control, including, but not limited to, Joseph C. Smith, Jr. and Alison G. Wheeler.

2. The term "Lexmark" means Lexmark International, Inc., as well as its employees, attorneys, licensees, agents, representatives, and investigators, as well as any company name under which Lexmark is or was doing business, its predecessors, parents, sisters, subsidiaries, divisions, directors, officers, employees, agents, distributors, jobbers, salespersons, sales representatives, licensors, licensees, and attorneys, and each person acting or purporting to act on its or their behalf or under its or their control.

3. The term "Pendl" means Pendl Companies, Inc., as well as its employees, attorneys, licensees, agents, representatives, and investigators, as well as any company name

under which Pendl is or was doing business, its predecessors, parents, sisters, subsidiaries, divisions, directors, officers, employees, agents, distributors, jobbers, salespersons, sales representatives, licensors, licensees, and attorneys, and each person acting or purporting to act on its or their behalf or under its or their control, including, but not limited to, Robert D. Becker (the author of the letter to Randy Pendl of August 26, 1999 (attached hereto as Tab 1)).

4. The term "Lexmark's Patents" means U.S. Patent Nos. 5,634,169, 5,707,743, 5,758,231, 5,758,233, 5,768,661, 5,802,432, 5,804,114, 5,874,172, 5,875,378, 5,880,244, 5,952,442, 5,995,772, 6,009,285, 6,009,291, 6,117,557, 6,160,073, 6,300,025, 6,397,015, 6,459,876, 6,487,383, 6,492,083, D399,249, and D458,300.

5. The term "Prebate Program" means and refers to Lexmark's Prebate program for the sale of certain Lexmark toner cartridges that are sold at a special price subject to a restriction that the cartridge be used only once and returned only to Lexmark. Lexmark's Prebate program was renamed the "Lexmark Return Program" on April 22, 2003.

6. The terms "document" or "documents" mean anything which would be a "writing" or "recording" as defined in Rule 1001(1) of the Federal Rules of Evidence or a "document" as defined in Rule 34(a) of the Federal Rules of Civil Procedure, including, without limitation, every original (and every copy of any original or copy which differs in any way from any original because of notations thereon or attachments thereto or otherwise) of every writing or recording of every kind of description, whether handwritten, typed, drawn, sketched, printed or recorded by any physical, mechanical, electronic or electrical means whatsoever, including without limitation, memoranda, correspondence, electronic mail, electronic data compilations, notes, books, records, papers, pamphlets, brochures, circulars, advertisements, specifications, blueprints, maps, plats, surveys, drawings, sketches, graphs, charts, plans, laboratory or

engineering reports, notebooks, worksheets, reports, lists, analyses, summaries, ledger accounts, audits, inventories, tax returns, financial statements, profit and loss statements, cash flow statements, balance sheets, annual or other periodic reports, prospectuses, registration, solicitations, minutes, appointment books, diaries, telephone bills and toll call records, expense reports, commission statements, itineraries, agenda, payroll records, checkbooks, canceled checks, receipts, contracts, agreements, instrument assignments, applications, offers, acceptances, proposals, financing statements, documents of title, appraisals, purchase orders, invoices, bills of lading, written memorials of oral communications, forecasts, photographs, photographic slides or negatives, films, filmstrips, x-rays, video or audio tapes and recordings.

7. The terms "thing" or "things" mean any tangible item, and shall be construed as broadly as possible under the Federal Rules of Civil Procedure.

8. The term "relating to" means alluding to, responding to, concerning, connected with, commenting on, in respect of, about, regarding, discussing, evidencing, showing, describing, reflecting, analyzing and/or constituting.

9. "And," "or," as well as "and/or," shall be construed disjunctively or conjunctively as necessary in order to bring within the scope of the request all responses which otherwise might be construed to be outside its scope.

10. The terms "any" and "all" shall be read to mean each and every.

11. The term "person" means a natural or judicial person, including any corporation, proprietorship, partnership, agency, or business association of any type.

## INSTRUCTIONS

1. In producing documents and things responsive to these requests, Bartlit Beck shall furnish all documents and things within its possession, custody or control, as they are kept in the

ordinary course of business or they shall be organized and labeled to correspond with the document requests to which they are responsive, regardless of whether these documents and things are possessed directly by Bartlit Beck or by its present or past agents, employees, companies, licensees, representatives, investigators, or attorneys.

2. If the attorney-client privilege or work product immunity is asserted as to any document or thing, or if any document or thing is not produced in full, produce the document or thing to the extent the request for production is not objected to, and, in so doing, state the following:

    (a) the specific ground(s) for not producing the document or thing in full;

    (b) the basis for such a claim of privilege or immunity and the facts supporting that basis; and

    (c) fully identify the information or material contained within the document or thing for which such privilege or immunity is asserted, including as applicable, the name of any document or thing; its date; the name, address and job title of each author or other person involved in its preparation, each addressee and each person to whom a copy of the document or thing has been sent or received; and the general nature of the document or thing (e.g., memoranda, letter).

3. Where an objection is made to a request, state all grounds upon which Bartlit Beck's objection is based.

4. If, after exercising due diligence, Bartlit Beck is unable to determine the existence of any documents or things falling within a specific request, Bartlit Beck shall so state in its written response.

5. With respect to each of the following requests, Bartlit Beck shall identify and/or produce all documents which are known to it or which can be located or discovered by Bartlit Beck through diligent effort on Bartlit Beck's part, including, but not limited to, all documents which are in the business or personnel files of Bartlit Beck employees or contained or stored within a computer in the possession of Bartlit Beck or its representatives, attorneys, or accountants, or accessible to Bartlit Beck, its employees, or its representatives, attorneys, or accountants.

6. Whenever used herein, the singular shall be deemed to include the plural and the plural shall be deemed to include the singular and the disjunctive shall be deemed to include the conjunctive and the conjunctive shall be deemed to include the disjunctive so as to elicit all information potentially responsive to the request for production and all of its context.

## REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS

**Request No. 1:** All documents and things relating to the subject matter discussed in Robert Becker's letter to Randy Pendl of August 26, 1999 (attached hereto as Tab 1).

**Request No. 2:** All documents and things that reflect, embody, or discuss communications between Bartlit Beck and Pendl relating to the subject matter discussed in Robert Becker's letter to Randy Pendl of August 26, 1999.

**Request No. 3:** All documents and things that reflect, embody, or discuss communications between Bartlit Beck and Pendl relating to Pendl's advice of counsel defense, including Pendl's decision to invoke the defense.

**Request No. 4:** All documents and things that reflect, embody, or discuss communications between Bartlit Beck and Pendl relating to the scope, validity, and/or enforceability of Lexmark's Prebate Program.

**Request No. 5:** All documents and things that reflect, embody, or discuss communications between Bartlit Beck and Pendl relating to communications with Pendl regarding the infringement of Lexmark's Patents.

**Request No. 6:** All documents and things that reflect, embody, or discuss communications between Bartlit Beck and Pendl relating to the antitrust implications, *vel non*, of Lexmark's Prebate Program.

**Request No. 7:** All documents and things that reflect, embody, or discuss communications between Bartlit Beck and Pendl relating to the contract law concerns, *vel non*, of Lexmark's Prebate Program.

**Request No. 8:** All documents and things that reflect, embody, or discuss communications between Bartlit Beck and Pendl relating to the issue of whether Pendl's remanufacturing of used toner cartridges constitutes permissible repair.

**Request No. 9:** All documents and things that reflect, embody, or discuss communications between Bartlit Beck and Pendl relating to the legal and/or factual bases set forth in Robert Becker's letter to Randy Pendl of August 26, 1999.

## EXHIBIT B

The definitions set forth in Exhibit A are incorporated herein by reference.

## DEPOSITION TOPICS

**Deposition Topic No. 1:** Communications between Bartlit Beck and Pendl relating to the subject matter discussed in Robert Becker's letter to Randy Pendl of August 26, 1999.

**Deposition Topic No. 2:** Communications between Bartlit Beck and Pendl relating to Pendl's advice of counsel defense, including Pendl's decision to invoke the defense.

**Deposition Topic No. 3:** Communications between Bartlit Beck and Pendl relating to the scope, validity, and/or enforceability of Lexmark's Prebate Program.

**Deposition Topic No. 4:** Communications between Bartlit Beck and Pendl relating to the infringement of Lexmark's Patents.

**Deposition Topic No. 5:** Communications between Bartlit Beck and Pendl relating to the antitrust implications, *vel non*, of Lexmark's Prebate Program.

**Deposition Topic No. 6:** Communications between Bartlit Beck and Pendl relating to the contract law concerns, *vel non*, of Lexmark's Prebate Program.

**Deposition Topic No. 7:** Communications between Bartlit Beck and Pendl relating to the issue of whether Pendl's remanufacturing of used toner cartridges constitutes permissible repair.

**Deposition Topic No. 8:** Communications between Bartlit Beck and Pendl relating to the legal and/or factual bases set forth in Robert Becker's letter to Randy Pendl of August 26, 1999.

# COUDERT BROTHERS

ATTORNEYS AT LAW

4 EMBARCADERO CENTER, SUITE 3300
SAN FRANCISCO, CA 94111
TEL: 415-986-1200 FAX: 415-986-0320

| | |
|---|---|
| NEW YORK | JAKARTA |
| PARIS | HO CHI MINH CITY |
| WASHINGTON | HANOI |
| LONDON | BERLIN |
| BRUSSELS | DENVER |
| HONG KONG | ST. PETERSBURG |
| SINGAPORE | MONTREAL |
| SAN FRANCISCO | ALMATY |
| BEIJING | PALO ALTO |
| SYDNEY | MEXICO CITY |
| LOS ANGELES | ASSOCIATED OFFICE RIOS FERRER Y GUILLÉN-LLARENA, S.C. |
| SAN JOSE | |
| TOKYO | BUDAPEST ASSOCIATED OFFICE NAGY ÉS TRÓCSÁNYI ÜGYVÉDI IRODA |
| MOSCOW | |
| BANGKOK | |

August 26, 1999

**Via Facsimile**

Mr. Randy Pendl
Pendl Companies, Inc.
170 N. Katch Dr.
Oconto, WI 53153

Re: <u>Lexmark Prebate Program</u>

Dear Mr. Pendl:

At the request of Bruce McCubbrey, I am writing to you in response to your request for an opinion on whether Pendl is authorized under the patent and contract laws of the United States to purchase used Lexmark Optra Se 3455 cartridges from cartridge brokers, recondition them, refill them with toner, and sell them as replacement cartridges for Lexmark Optra Se printers.

For purposes of our analysis we have assumed that the Lexmark cartridges are covered by one or more patents issued to Lexmark, and that one or more claims of those patents would read on the replacement cartridges sold by Pendl. We also have assumed that Pendl repairs the Lexmark cartridges, but does not reconstruct them. A "reconstruction" is the creation of a new product after the original product, viewed as a whole, has become spent.

Although no court has decided the particular issue presented by the specific facts in your case, we are of the opinion that Pendl is authorized to sell the above-mentioned replacement cartridges for Lexmark Optra Se printers. Lexmark sells the Prebate cartridges to consumers. As a general matter, the sale of a patented product exhausts the patent owner's right to control the purchaser's use of the device thereafter. The theory behind the general rule is that in such a transaction, the patentee has bargained for, and received, an amount equal to the full value of the goods, and title to the goods has vested in the purchaser by virtue of the sale and purchase. *See Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg.*, 43 USPQ.2d 1650, 1656 (Fed. Cir. 1997). We believe the general rule applies here. The evidence demonstrates that Lexmark receives full

326383.2

Confidential -- Attorney's Eyes Only

PE00991

value for the Prebate cartridges, and that title has passed to the purchaser. The evidence also demonstrates that the Prebate conditions are void as against publicly policy, for they are not designed to secure to Lexmark the return of licensed products, but instead are designed to improperly expand the physical scope of the Lexmark patents to restrain competition in the aftermarket. Our preliminary analysis of Lexmark's position is set forth below.

Lexmark sells new Optra Se 3455 cartridges in two different ways: Prebate and non-Prebate. According to Lexmark's web site:

> Prebate resembles a rebate except the discount is immediate when you purchase. This allows you to buy a 100% brand-new Lexmark cartridge for your Optra Se at a discount, if you agree to use it only once, then return it to Lexmark free of charge. These cartridges are exactly the same cartridges you'd get if you paid full price, but if for some reason you prefer not to take advantage of Prebate, you can buy these cartridges at regular prices and terms using the non-Prebate part numbers listed above.

Lexmark sells the Prebate cartridge for $233.95 and the non-Prebate cartridge for $263.95. Lexmark claims that customers benefit through lower prices and higher quality.[1]

The Prebate cartridge outsells the non-Prebate cartridge by at least seven to one, and that number may grow due to the fact that many dealers appear to be unwilling to stock non-Prebate cartridges. Lexmark admits that it does not intend to enforce the Prebate conditions against its customers, and we understand that 30% or less of the cartridges are actually returned to Lexmark. We also understand that the value of the used cartridge is about $10.00. The cartridges that are returned to Lexmark are remanufactured by Lexmark and sold to select dealers for resale. *See* "The Lexmark Prebate Program — Lexmark Hearing: New York takes on Prebate" (May 1998).[2]

Lexmark claims that the Prebate program is sanctioned by the Federal Circuit's opinion in *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700 (Fed. Cir. 1992). Lexmark is wrong. No Court has sanctioned a Prebate program. *Mallinckrodt* involved the sale of a patented device (the "UltraVent" device) for delivery of radioactive or therapeutic material in aerosol mist form to the lungs of a patient, for diagnosis and treatment of pulmonary disease. The UltraVent device fits into a lead shielded container that is provided by Mallinckrodt to minimize exposure to radiation

---

[1] According to Lexmark, remanufactured cartridges have lower quality and yield and they're "hoping that the Prebate program helps address this." See "In Defense of Lexmark's Prebate Program."

[2] www.rechargermag.com/rechargermag/lexhearing.htm

and for safe disposal after use. The device is manufactured by Mallinckrodt and bears the inscription "Single Use Only". The package insert provided with each UltraVent unit states "For Single Patient Use Only" and instructs that the entire contaminated apparatus be disposed of in accordance with procedures for the disposal of biohazardous waste. Certain hospitals did not dispose of the UltraVent device, or limit it to a single use. Instead, the hospitals shipped used manifold/nebulizer assemblies to Medipart for reconditioning. The reconditioned units were shipped back to the hospitals for another use.

Mallinckrodt filed suit against Medipart, asserting infringement and inducement to infringe Mallinckrodt patents. Both parties moved for summary judgment on all counts. The district court granted Medipart's motion on the patent infringement counts, holding that the "Single Use Only" restriction could not be enforced by suit for patent infringement. *Mallinckrodt, Inc. v. Medipart, Inc.*, 15 USPQ.2d 1113 (N.D. Ill. 1990). The district court reasoned, after reviewing numerous Supreme Court decisions, that in cases where the purchaser buys directly from the patent owner, no restrictions on future use were enforceable. Because the court found that no restrictions were enforceable under the patent laws when the purchaser buys directly from the patent owner, the court did not decide whether the particular "Single Use Only" condition was otherwise enforceable.

The Federal Circuit understood the district court to hold that "no restriction whatsoever could be imposed under the patent law, whether or not the restriction was enforceable under some other law, and whether or not this was a first sale to a purchaser with notice." *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d at 701. The Federal Circuit disagreed with this reading of the case and reversed and remanded the case to the district court for a determination on *whether* "the sale of the UltraVent was validly conditioned under the applicable law such as the law governing sales and licenses, and if the restriction on reuse was within the scope of the patent grant or otherwise justified." *Id.* at 709. Thus, contrary to Lexmark's statements, the Federal Circuit did not hold that a single use restriction was "indeed legal."

Turning to the question of whether the Prebate conditions are within the patent grant, or otherwise justified, the simple answer is no. Although "Prebate" is a new word, there is nothing new about it conceptually. Companies have been trying to control aftermarkets for years. It is an old story: give away the razor (printer) and sell the blades (cartridges). IBM did something similar up until 1956, when the U.S. Department of Justice required IBM to sign a consent decree or face a lawsuit for violating the antitrust laws. IBM used to have a policy of only leasing computers, not selling them. As the lessor, IBM could control aftermarkets such as the lucrative aftermarket for the maintenance of its computers. IBM, for example, could require its licensees to use IBM for service, and IBM could make sure that there was no market for used machines or new or used parts.

Confidential — Attorney's Eyes Only

PE00993

Mr. Randy Pendl
August 26, 1999
Page 4

There is no question over whether authority is required to make, use or sell a patented invention. The patent statute provides that "whoever without authority makes, uses, ... or sells any patented invention, in the United States ... during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a) (1994). Authority is obtained by a purchaser, however, through the sale of a patented product, because the sale, as a general matter, exhausts the patent owner's rights with respect to the product. The theory behind this rule (the "exhaustion doctrine") is that in such a transaction, the patentee has bargained for, and received, an amount equal to the full value of the goods. See *Adams v. Burke*, 84 U.S. (17 Wall.) 453, 456-57 (1874); *United States v. Univis Lens Co.*, 316 U.S. 241, 250-251 (1942).

Numerous Supreme Court decisions address the issue of whether a patent owner may limit exhaustion by imposing express conditions on the sale of a patented device. A long line of cases, including *Dr. Miles Medical Co. v. Park & Sons Co.*, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502, *Bauer & Cie v. O'Donnell*, 229 U.S. 1, 33 S.Ct 616, 57 L.Ed. 1041 (1913), *Strauss v. Victor Talking Machine Co.*, 243 U.S. 490, 37 S.Ct 412, 61 L.Ed. 866 (1917), *Motion Picture Patents Co. v. Universal Film Manufacturing Co.*, 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871 (1917), and *Boston Store of Chicago v. American Graphophone*, 246 U.S. 8, 23, 38 S.Ct 257, 260, 62 L.Ed. 551 (1918), hold that a patent owner may not limit exhaustion by imposing express conditions on the *sale* of a patented device. Commenting on *Straus* and *Motion Picture Patents*, the Supreme Court summarized the state of the law:

> Reiterating the ruling in the last two cases it was again decided that as by virtue of the patent law one who sold a patented machine and received the price and had thus placed the machine so beyond the confines of the patent law, could not by qualifying restrictions as to use keep under the patent monopoly a subject to which the monopoly no longer applied. *Boston Store of Chicago v. American Graphophone*, 246 U.S. 25, 38 S.Ct 261.

The Court further explained that it was not depriving inventors of:

> ... any right coming within the patent monopoly, since the cases alone concerned whether the monopoly of the patent law can be extended beyond the scope of that law or, in other words, applied to articles after they have gone beyond its reach. The proposition so earnestly insisted upon that while this may be true, it does not fairly consider the reflex detriment to come to the rights of property of the inventor within the patent law as a result of not recognizing the right to continue to apply the patent law as to objects which have passed beyond its scope, is obviously not one of judicial cognizance 246 U.S. 26, 38 S.Ct 261.

The point to be taken from the language quoted above is that one cannot sell a patented machine, receive the price, and expect the device to remain under the patent monopoly.

Confidential – Attorney's Eyes Only

PE00994

COUDERT BROTHERS

Mr. Randy Pendl
August 26, 1999
Page 5

Other Supreme Court cases address the related issue of whether a patentee may grant a license to manufacture a patented device for a particular use, while reserving the right to manufacture a patented device for a different use. In *General Talking Pictures Corp. v. Western Electric Co.*, the patentees granted licenses to manufacture amplifiers for home use, but reserved the right to manufacture amplifiers for the commercial/industrial market for themselves. 305 U.S. 124, 59 S.Ct. 116 (1938). The Supreme Court held that a patentee may grant a license that is reasonably within the rights conferred by the patent grant, and observed that a license to manufacture within a particular field of use appeared to be within the exclusive right to make a patented device:

> The question of law requiring decision is whether the restriction in the license is to be given effect. That a restrictive license is legal seems clear. As was said in *United Sales v. General Electric Co.*, the patentee may grant a license 'upon any condition the performance of which is reasonably within the reward which the patentee by the grant of the patent secured.' The restriction here is of that character. The practice of granting licenses for a restricted use is an old one. So far as appears, its legality has never been questioned. The parties stipulated that 'it is common practice where a patented invention is applicable to different uses to grant written licenses to manufacture under United States Letters patents restricted to one or more of the several fields of use permitting the exclusive or non-exclusive use of the invention by the licensee in one field and excluding it in another field.'
>
> As the restriction was legal and the amplifiers were made and sold outside the scope of the license, the effect is precisely as if no license whatsoever had been granted Transformer Company. And as Pictures Corporation knew the facts, it is in no better position than if it had manufactured the amplifiers itself without license to do so. 305 U.S. at 127, 59 S.Ct. at 117 (internal citations omitted).

One important distinction between the Supreme Court cases is that the patentees in the former set of cases sold patented articles and received the price of the articles, and thus placed the articles sold beyond the confines of the patent law, while the patentees in *General Talking Pictures* merely licensed the right to make patented articles for a particular field of use under their right to exclude all or part of the patent grant. A further important distinction is that the patentees in the former set of cases attempted to fix resale prices or otherwise violate the antitrust laws, while the patentees in *General Talking Pictures* apparently did not. A close examination of the cases reveals that the Lexmark Prebate program falls squarely within the former set of cases.

In *Bauer & Cie v. O'Donnell*, 229 U.S. 1, 33 S.Ct 616, 57 L.Ed. 1041 (1913), the patentee had sold a product with a notice stating that the product "is licensed by us for sale and use at a price not less than one dollar. Any sale in violation of this condition, or use when so sold,

33633032

Confidential -- Attorney's Eyes Only

PE00995

will constitute an infringement." 229 U.S. at 8, 33 S. Ct at 616. The Supreme Court held the license unenforceable, stating that although it was the intention of congress to secure an exclusive right to sell, there is no grant of a privilege to keep up prices and prevent competition by notices restricting the price at which the article may be sold. 229 U.S. at 17, 33 S. Ct at 619; *See Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 704 (Fed. Cir. 1992). The Court decided the case under the right to "vend" or sell and reserved any express statement on the scope of the right to "use." *See Boston Store of Chicago v. American Graphophone*, 246 U.S. 8, 23, 38 S.Ct 257, 260, 62 L.Ed. 551 (1918).

In *Strauss v. Victor Talking Machine Co.*, 243 U.S. 490, 37 S.Ct 412, 61 L.Ed. 866 (1917), the patentee had attached a "License Notice" to its phonographic machines for marketing purposes. The License Notice provided that the machine may be used only with sound records and needles manufactured by the licensee, specified a minimum transfer price, and reserved the right to inspect, test and repair the machine and instruct the user in its use. 243 U.S. at 501, 37 S.Ct at 415. The defendant was charged with patent infringement for inducing licensees to part with used machines at less than the specified minimum transfer price. Observing that the plaintiff received full compensation at the time the patented machine was first sold, that the notice failed to provide sufficient tools to allow enforcement of the rights set forth in the notice, and that large numbers of the machines had been sold by authorized licensees at less than the price fixed for them, the Supreme Court brushed aside the forms of expression as to the license and held:

> The scheme of distribution is not a system designed to secure to the plaintiff and to the public a reasonable use of its machines, within the grant of the patent laws, but is in substance a mere price fixing enterprise, which if given effect, would work great and widespread injustice to innocent purchasers .... It would be a perversion of terms to call the transaction intended to be embodied in this system of marketing plaintiff's machines a 'license to use the invention.'
>
> Convinced, as we are, that the purpose and effect of this "License Notice" of plaintiff, considered as a part of its scheme for marketing its product, is not to secure to the plaintiff any use of its machines, and as is contemplated by the patent statutes, but that its real and poorly-concealed purpose is to restrict the price of them, after the plaintiff had been paid for them and after they have passed into the possession of the dealers and of the public, we conclude that it falls within the principles of *Adams v. Burke*; and of *Bauer v. O'Donnell*; that it is, therefore, invalid ....    243 U.S. at 501, 37 S.Ct at 415 (internal citations omitted).

There are strong parallels between the Lexmark Prebate program and the "License Notice" described in *Strauss*. The purpose of the Prebate is not to protect the environment, or consumers, or to secure the return of the Lexmark Optra Se 3455 cartridges. Rather, the purpose of the Prebate is to destroy competition in the aftermarket.

3153383.2

Confidential -- Attorney's Eyes Only

PE00996

The Prebate cartridges are offered for sale at $233.95 on the Lexmark web-site with the following notice: "Sold at a special price with the understanding that you return your empty cartridge only to Lexmark." If we look through the words and forms with which Lexmark has elaborately enveloped its purpose, as the Supreme Court did in the *Strauss* case, to the substance and the realities of the transaction contemplated, we discover several noticeable features. First, while some of the notice terms concern "use" of the cartridges, the cartridges are "sold" to consumers. Second, Lexmark eliminates any future risks by requiring full payment up front before it parts with a cartridge. Third, while in terms the "use" of the cartridge is restricted, and the purchaser is required to "return" the cartridge to Lexmark after just one use, the Prebate program fails to provide any mechanism for Lexmark to enforce the terms of the program against its customers. Fourth, Lexmark does not seek to enforce the return of the cartridges against its customers, and admits that the return requirement is nothing more than strong encouragement (*see discussion below*). Fifth, the re-sale price fixed by Lexmark is far above the $10.00 street re-sale price of the cartridge. And finally, only 30% or so of the Prebate cartridges are returned. Collectively this is persuasive evidence that the Prebate transaction is not designed to secure to Lexmark a reasonable use and return of the patented cartridges within the grant provided by the patent laws, but is in substance an anti-competitive scheme which is not justifiable under the rule of reason.[3]

Lexmark claims that the Prebate program is legal under the antitrust laws because of the availability of non-Prebate cartridges. There is no merit to this argument because Lexmark controls the market for cartridges for Lexmark Optra printers, and markets and prices the non-Prebate cartridge to ensure control of the aftermarket for the cartridges. A similar scheme to control the aftermarket was held to be illegal in the *Kodak* case, where key service parts were made unavailable to independent servicers. *Eastman Kodak v. Image Technical Services*, 504 U.S. 481, 112 S.Ct 2072 (1992).

In view of the above, it is our opinion that Lexmark cannot enforce the Prebate conditions by action for patent infringement because they are outside of the patent rights granted to Lexmark, and cannot enforce them by action for breach of contract because they violate the antitrust laws. Our conclusion is consistent with the holding in *Mallinckrodt*, which calls for a determination of whether the conditions are reasonably within the patent grant, and, if not, whether the patentee has ventured beyond the patent grant and into behavior having an anticompetitive effect not justifiable under the rule of reason." 876 F.2d at 708.

---

[3] The justification with the most appeal, the protection of the public health, asserted in *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700 (Fed. Cir. 1992), *Tripoli Co. v. Wella Corp.*, 425 F.2d 932, 936-38 (3d Cir.)(en banc), *cert. denied*, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970), and *Marks, Inc. v. Polaroid Corp.*, 237 F.2d 428, 435 (1st Cir. 1956), cert. denied, 352 U.S. 1005, 77 S.Ct. 564, 1 L.Ed.2d 550 (1957), is not present here.

Confidential — Attorney's Eyes Only

PE00997

COUDERT BROTHERS

Mr. Randy Pendl
August 26, 1999
Page 8

The analysis set forth above assumes that the Prebate conditions otherwise bind the purchaser, but there is significant evidence to suggest that the Prebate conditions would not be binding on the purchaser. For example, in response to the argument that the Prebate program was designed to be anti-competitive, Lexmark wrote:

— We considered mandatory return of the empty discounted versions, but we expected our customers would be concerned about complying with a "mandatory return" requirement

— We did the next best thing — on the discounted versions we strongly encouraged the returns, and allowed returns only to Lexmark (with our Prebate license terms). "Let's Set The Record Straight On Prebate."

These statements are in direct conflict with the only condition which accompanies the sale of the Prebate cartridge on the Lexmark web site, "Sold at a special price with the understanding that you return your empty cartridge only to Lexmark", and indicate that the purchaser is not bound by it.

Please contact us if you wish to discuss the particulars of the Prebate program and its specific effect on you and the aftermarket.

Best regards.

Very truly yours,

Robert D. Becker

RDB:sl

Confidential — Attorney's Eyes Only

PE00998