IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 06-cv-02182-JLK-BNB

STATIC CONTROL COMPONENTS, INC.,

Plaintiff,

v.

LEXMARK INTERNATIONAL, INC.,

Defendant/Counterclaim Plaintiff,

v.

WAZANA BROTHERS INTERNATIONAL INC., d/b/a MICRO SOLUTIONS ENTERPRISES,

Counterclaim Defendant,

v.

STATIC CONTROL COMPANIES, INC.,

Counterclaim Defendant,

v.

NER DATA PRODUCTS, INC.,

Counterclaim Defendant.
_____

**ORDER**
_____

This matter is before me on the **Motion to Quash Improper Subpoena Served On Opposing Party's Trial Counsel** [Doc. # 1, filed 10/30/2006] (the "*Motion*") filed by the law firm of Bartlit Beck Herman Palenchar & Scott ("Bartlit Beck"). Bartlit Beck is not a party to

any action relevant here, but it is trial counsel for Static Control Components, Inc. ("Static Control").  The *Motion* is GRANTED, and the discovery shall not be had.

I.

The subpoena at issue here was served in connection with an underlying action, Case No. 04-CV-84-GFVT, pending in the United States District Court for the Eastern District of Kentucky (the "Underlying Action").  Bartlit Beck is trial counsel for Static Control in the Underlying Action.

The Underlying Action concerns allegations of patent infringement.  According to Lexmark:

> Lexmark is a manufacturer of laser printers and toner cartridges for use with those printers.  Lexmark's toner cartridges at issue in this case are covered by several of Lexmark's patents.  Lexmark sells many of its patented toner cartridges at a reduced price but subject to a single-use patent license known as the "Prebate" program or the "Return Program."  Lexmark also sells some of its patented cartridges at a regular price without the single-use patent license.  The single-use patent agreement currently reads:
>
> "**Return Empty Cartridge to Lexmark for Remanufacturing and Recycling**
>
> "Please read before opening.  Opening this package or using the patented cartridge inside confirms your acceptance of the following license agreement.  This patented Return Program cartridge is sold at a special price subject to a restriction that it may be used only once.  Following this initial use, you agree to return the empty cartridge only to Lexmark for remanufacturing and recycling.  If you don't accept these terms, return the unopened package to your point of purchase.  A regular price cartridge without these terms is available."
>
> \* \* \*
>
> Counterclaim Defendant Static Control is a supplier of parts and related products for use in remanufactuirng (sometimes called refilling) toner cartridges after their initial use (*i.e.*, depletion of

2

> toner within the cartridge). For example, Static Control sells toner, microchips, drums, tools, and other components to its customers, who use these products to refill and otherwise remanufacture empty Lexmark toner cartridges. The end result of this remanufacturing process is to allow the cartridges to be re-used in Lexmark's laser printers. Each of the three other Counterclaim Defendants in this matter--Pendl, NER, and Micro Solutions Enterprises ("MSE")--is a customer of Static Control. Pendl, NER, and MSE each buys products from Static Control to remanufacture empty Lexmark toner cartridges to then re-sell to Lexmark's customers.
>
> Lexmark's patent claims against Static Control and these remanufacturer defendants relate to the unlawful remanufacture and resale of Lexmark's toner cartridges. Lexmark's patent infringement claims primarily focus upon toner cartridges that Lexmark sells subject to the Prebate agreement, as described above. Lexmark's position is that the remanufacture of these single-use only cartridges by Pendl and others constitutes patent infringement, and that Static Control contributes to and/or induces Pendl's infringement.

*Lexmark International, Inc.'s Opposition to Motion to Quash Subpoena on Opposing party's Trial Counsel* [Doc. # 16, filed 11/27/2006] (the "*Response*") at pp.5-7.

On October 12, 2006, a co-defendant in the Underlying Action, Pendl, stated that it would rely on an advice-of-counsel defense to Lexmark's patent infringement claims. Id. at p.8. Thereafter, Pendl produced a letter dated August 26, 1999, written by Robert D. Becker, a lawyer then practicing at the law firm of Coudert Brothers (the "Becker Letter"). Becker was acting as counsel for Pendl at the time the Becker Letter was written. Among other things, the Becker Letter states that "[a]lthough no court has decided the particular issue presented by the specific facts in your case, we are of the opinion that Pendl is authorized to sell the above-mentioned replacement cartridges for Lexmark Optra Se printers." *Motion*, at Exh.4, pp.1-2.

Lexmark's subpoena to Bartlit Beck is intended to explore Pendl's state of mind with respect to willful infringement, and it commands the production by Bartlit Beck of nine categories of documents and the testimony of a representative of Bartlit Beck on eight enumerated topics. The production requests include: (1) "[a]ll documents and things relating to the subject matter discussed in Robert Becker's letter to Randy Pendl of August 26, 1999"; all documents and things that reflect, embody, or discuss communications between Bartlit Beck and Pendl relating to (2) "the subject matter discussed in Robert Beck's Letter to Randy Pendl of August 26, 1999"; (3) "Pendl's advice of counsel defense, including Pendl's decision to invoke the defense"; (4) "the scope, validity, and/or enforceability of Lexmark's Prebate Program";
(5) "communications with Pendl regarding the infringement of Lexmark's Patents"; (6) "the antitrust implications, *vel non*, of Lexmark's Prebate Program"; (7) "the contract law concerns, *vel non*, of Lexmark's Prebate Program"; (8) "the issue of whether Pendl's remanufacturing of used toner cartridges constitutes permissible repair"; and (9) "the legal and/or factual bases set forth in Robert Becker's letter to Randy Pendl of August 26, 1999." *Motion*, Exh. 6 (hereafter the "Subpoena") at Requests for Production 1-9. The deposition topics specified in the Subpoena include communications between Bartlit Beck and Pendl relating to: (1) "the subject matter discussed in Robert Becker's letter to Randy Pendl of August 26, 1999"; (2) "Pendl's advice of counsel defense, including Pendl's decision to invoke the defense"; (3) "the scope, validity, and/or enforceability of Lexmark's Prebate Program"; (4) "the infringement of Lexmark's Patents"; (5) "the antitrust implications, *vel non*, of Lexmark's Prebate Program"; (6) "the contract law concerns, *vel non*, of Lexmark's Prebate Program"; (7) "the issue of whether Pendl's remanufacturing of used toner cartridges constitutes permissible repair"; and (8) "the legal and/or

factual bases set forth in Robert Becker's letter to Randy Pendl of August 26, 1999."
Significantly, the subpoena defines "Pendl" to include Pendl's lawyers. Id. at Deposition Topics 1-8.

It is undisputed that Bartlit Beck does not represent Pendl in the Underlying Action. *Motion*, Exh.3 (hereafter the "Smith Aff.") at ¶4. It also is undisputed that there have been no direct communications between Bartlit Beck and any of the employees of Pendl. Id. at ¶9.

Bartlit Beck and the lawyers for Pendl and two other co-defendants in the Underlying Action[1] have entered into a "common interest agreement," however, and consistent with that agreement Bartlit Beck has communicated with the lawyers for Pendl, NER, and MSE as follows:

> Bartlit Beck has participated with counsel for [Pendl, NER, and MSE] in privileged communications concerning matters of common interest to those parties' preparation for trial pursuant to a common interest agreement. The common interest agreement does not contemplate the provision of, nor has it been used to provide, any party with any opinions as to the validity or infringement of any patent.

Id. at ¶7.

What Lexmark seeks to obtain through the Subpoena are documents and communications between Bartlit Beck and Pendl's lawyers, exchanged pursuant to the common interest agreement, concerning the Becker Letter and Pendl's advice of counsel defense. Lexmark concedes as much, arguing that it is entitled to "full discovery of Pendl's state of mind," including communications between Bartlit Beck and Pendl, "via Pendl's counsel, regarding the *subject matter* of the Becker Opinion (*i.e.*, the validity of Lexmark's Prebate Program, the enforceability

---

[1] The two other co-defendants who are parties to the common interest agreement are NER Data Products, Inc.; and Wazana Brothers International, Inc.

5

of Lexmark's patents against Pendl, and the infringement of Lexmark's patents)." *Response*, at p3.

II.

Initially I must determine whether documents and information exchanged between the lawyers for Static Control and the lawyers for Pendl are subject to any privilege or immunity from discovery. Bartlit Beck argues that the information sought through the subpoena is not discoverable because it otherwise is privileged and was exchanged pursuant to a common interest agreement.

The common interest doctrine, frequently referred to by federal courts as the joint defense privilege,[2] has been defined as follows:

> The joint defense privilege preserves the confidentiality of communications and information exchanged between two or more parties and their counsel who are engaged in a joint defense effort. Waiver of the joint defense privilege requires the consent of all parties participating in the joint defense. [T]he joint defense privilege is merely an extension of the attorney-client privilege and

---

[2]As the court noted in Securities Investor Protection Corp. v. Stratton Oakmont, Inc., 213 B.R. 433, 435 n.1 (Bankr. S.D.N.Y 1997):

> Federal courts have used the term "joint defense privilege" to refer to both the joint client privilege and the common interest rule privilege. . . . The joint client doctrine applies when clients share the same lawyer; whereas the common interest or allied lawyer doctrine applies when parties with separate lawyers consult together under the guise of a common interest or defense. Although the doctrines are conceptually different, the interchangeable use of the phrase "joint defense privilege" to refer to both of them has engendered considerable confusion.

Here, as did the court in the Securities Investor case, I use the term joint defense privilege to refer to the situation where independently represented parties have agreed in one manner or another to pursue a joint defense.

6

> the work-product doctrine. In other words, it confers no
> independent privileged status to documents or information. Thus,
> to be eligible for protection under the joint defense privilege, it
> must be established that the materials fall within the ambit of either
> the attorney-client privilege or the qualified immunity afforded to
> work product.

Metro Wastewater Reclamation Dist. v. Continental Casualty Co., 142 F.R.D. 471, 478 (D. Colo. 1992); accord Securities Investor Protection Corp. v. Stratton Oakmont, Inc., 213 B.R. 433, 435 (Bankr. S.D.N.Y. 1997). In addition, a party invoking the joint defense privilege to avoid discovery must establish that the withheld information (1) arose in the course of a joint defense effort and (2) was designed to further that effort. In re Grand Jury Proceedings, 156 F.3d 1038, 1042-43 (10th Cir. 1998).

Here, there is no dispute that Lexmark has brought suit in the Eastern District of Kentucky against Static Control, Pendl, NER, and MSE alleging willful infringement of Lexmark's patents. *Response*, at p.2. The only evidence before me on the issue of the applicability of the joint defense privilege is the Affidavit of Joseph C. Smith, Jr., in which Mr. Smith states:

> Bartlit Beck has participated with counsel for the parties with which
> Static Control is aligned in this litigation--NER Data Products, Inc.;
> Pendl Companies, Inc. ("Pendl"); and Wazana Brothers
> International, Inc. [d/b/a Micro Solutions Enterprises ("MSE")]--in
> privileged communications concerning matters of common interest
> to those parties' preparation for trial, pursuant to a common
> interest agreement. The common interest agreement does not
> contemplate the provision of , nor has it been used to provide, any
> party with any opinions as to the validity or infringement of any
> patent.
> 
> \* \* \*

> There have been no communications between Bartlit Beck and Pendl Companies, Inc.

Smith Aff. at ¶¶7, 9.

Based on the evidence before me, I find that Static Control, Pendl, NER, and MSE have entered into a joint interest agreement. Information was exchanged between Static Control, Pendl, NER, and MSE, and their respective lawyers, in "privileged communications" in connection with those parties' preparation for trial against Lexmark. That information is therefore subject to the attorney-client privilege, the work-product doctrine, and the joint defense privilege.

Lexmark does not seriously dispute the existence or applicability of the joint defense privilege to the information commanded by the Subpoena, arguing instead that the discovery is appropriate anyway. *Response* at p.12. Lexmark does argue, however:

> [T]he alleged common interest agreement should not be given any weight by this Court because the parties' legal interests do not coincide s evidenced by the fact that NER has asserted a claim against and has served discovery on Static Control.

*Response*, at p.12 n.5.

Even if there is adversity between some of the parties to the common interest agreement, they still may invoke the joint defense privilege to protect communications from disclosure to third parties like Lexmark. Thomas E. Spahn, <u>A Practitioner's Guide to the Attorney-Client Privilege and the Work Product Doctrine</u> (2001) at §5.310(B), and collected cases.

III.

In <u>In re EchoStar Communications Corporation</u>, 448 F.3d 1294 (Fed. Cir. 2006), the Court of Appeals for the Federal Circuit held:

> Once a party announces that it will rely on advice of counsel, for example, in response to an assertion of willful infringement, the attorney-client privilege is waived. The widely applied standard for determining the scope of a waiver of attorney-client privilege is that the waiver applies to all other communications relating to the same subject matter.

448 F.3d at 1299 (internal citations and quotations omitted).[3]

The circuit court in <u>In re EchoStar</u> also affirmed the decision of the district court that the waiver of the attorney-client privilege applied to the advice of "any counsel regarding infringement, . . . either before or after the filing of the complaint. . . ." <u>Id</u>. at 1297. As the court stated, "[t]he overarching goal of waiver in such a case is to prevent a party from using the advice he received as both a sword, by waiving privilege to favorable advice, and a shield, by asserting privilege to unfavorable advice." <u>Id</u>. at 1303.

With respect to the waiver of the work product immunity, however, the circuit court held:

> The second category of work product [previously defined as those documents analyzing the law, facts, trial strategy, and so forth that reflect the attorney's mental impressions but were not given to the

---

[3]Pursuant to the mandate of the Federal Circuit, I apply its law and not the law of the Tenth Circuit to the issue of privilege where, as here, the advice of counsel defense is involved:

> Federal Circuit law applies when deciding whether particular written or other materials relate to an issue of substantive patent law. A remedy for willful patent infringement is specifically provided for in the Patent Act; therefore, questions of privilege and discoverability that arise from assertion of the advice-of-counsel defense necessarily involve issues of substantive patent law.

<u>In re EchoStar</u>, 448 F.3d at 1298 (internal quotations and citations omitted).

9

> client], which is never communicated to the client , is not discoverable. Under Rule 26(b)(3), this so-called "opinion" work product deserves the highest protection from disclosure. While an accused infringer may waive the immunity for work product that embodies an opinion in letters and memorandum communicated to the client, he does not waive the attorney's own analysis and debate over what advice will be given. Upon waiver of attorney-client privilege, communicative documents, such as opinion letters, become evidence of a non-privileged, relevant fact, namely what was communicated to the client; however, counsel's legal opinions and mental impressions that were not communicated do not acquire such factual characteristics and are, therefore, not within the scope of the waiver.

Id. at pp1303-04.

The thrust of the Federal Circuit's decision in In re EchoStar is simply that when a party asserts the advice of counsel defense to willful infringement, it waives any claim of privilege or immunity it has with respect to all communications that **the client received**, at whatever time and from whatever counsel, on the issue of the alleged infringement. This rule allows the opposing party to probe fully all advice received by the alleged infringer and which played any part in its belief concerning infringement. That, however, is as far as the waiver goes. "By asserting the advice-of-counsel defense to a charge of willful infringement, the accused infringer and his or her attorney do not give their opponent unfettered discretion to rummage through all of their files and pillage all of their litigation strategies." Id. at 1303. Documents and information not provided to the alleged infringer, and which therefore played no part in its decisions concerning the alleged infringement, maintain their privileged nature. Id. at 1305. In particular, "counsel's legal opinions and mental impressions that were not communicated . . . [are] not within the scope of the waiver." Id. at 1304.

My conclusion that In re EchoStar requires the disclosure only of materials and information provided to Pendl, and does not require the disclosure of information provided to Pendl's lawyers but never communicated to Pendl itself, is consistent with the ruling of the court in Intex Recreation Corp. v. Team Worldwide Corp., 439 F. Supp. 2d 46 (D.D.C. 2006), where under similar facts the court held:

> A "middle ground" is the most appropriate approach to this issue, under which waiver extends only to those trial counsel work product materials **that have been communicated to the client** and contained conclusions or advice that contradict or cast doubt on the earlier opinions.

439 F. Supp. 2d at 52 (internal citations and quotations omitted; emphasis added).

In this case, Bartlit Beck had no direct communications with any employee of Pendl. Any communications by Bartlit Beck concerning the issue of infringement were with Pendl's lawyers and pursuant to the common interest agreement. Consequently, the rule of In re EchoStar does not apply here to require the disclosure of information exchanged between Bartlit Beck and Pendl's lawyers unless the information was thereafter transmitted to Pendl itself. Bartlit Beck cannot know what information was communicated between Pendl's lawyers and Pendl, of course, and the proper source of that discovery is Pendl or its lawyers, not Bartlit Beck.

IV.

Alternatively, I find that the Subpoena should be quashed pursuant to Boughton v. Cotter, 65 F.3d 823 (10th Cir. 1995). Relying on Shelton v. American Motors Corp., 805 F.2d 1323, 1327 (8th Cir. 1986), the Tenth Circuit Court of Appeals in Boughton held:

> Taking the deposition of opposing counsel not only disrupts the adversarial system and lowers the standards of the profession, but it also adds to the already burdensome time and costs of litigation. It

> is not hard to imagine additional pretrial delays to resolve work-product and attorney-client objections, as well as delays to resolve collateral issues raised by the attorney's testimony. Finally, the practice of deposing counsel detracts from the quality of client representation. Counsel should be free to devote his or her time and efforts t preparing the client's case without fear of being interrogated by his or her opponent.

Boughton, 65 F.3d at 829 (internal quotations and citations omitted).

Consequently, before a party may depose its opposing counsel it first must make a showing that "(1) no other means exist to obtain the information than to depose opposing counsel; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case." Id. Lexmark has not and cannot meet this burden.

First, not only is Bartlit Beck not the sole source of the requested information, it is the wrong source. The relevant inquiry under In re EchoStar is what information Pendl received and considered in connection with the issue of infringement. Bartlit Beck had no communications with Pendl; its communications were with Pendl's lawyers only. Bartlit Beck does not know what part of those communications, if any, was passed on to Pendl. Lexmark must obtain discovery of the information concerning the issue of infringement communicated to Pendl from Pendl itself or its lawyers.

Second, under In re EchoStar, information not communicated to the party, including the uncommunicated work product of the party's own lawyers, is not relevant to the advice of counsel defense and is not crucial to Lexmark's preparation of its case.

V.

IT IS ORDERED that the Motion to Quash Improper Subpoena Served On Opposing Party's Trial Counsel [Doc. #1] is GRANTED. The discovery commanded by the Subpoena shall not be had.

IT IS FURTHER ORDERED that Bartlit Beck's request for attorneys' fees is DENIED.

Dated January 25, 2007.

BY THE COURT:

s/ Boyd N. Boland
United States Magistrate Judge